Filed 2/28/22  In re R.H. CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| In re R.H., et al., Persons Coming Under the Juvenile Court Law. | B311824 |
| _____ DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.G., et al.,<br><br>Defendants and Appellants. | (Los Angeles County Super. Ct. No. 17CCJP00006ABC) |

APPEALS from orders of the Superior Court of Los Angeles County, Linda Sun, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant L.G.

Christopher R. Booth, under appointment by the Court of Appeal, for Defendant and Appellant E.H.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel and David Michael Miller, Deputy County Counsel for Plaintiff and Respondent.

L.G. (mother) and E.H. (father) appeal from orders terminating their parental rights to their children under Welfare and Institutions Code section 366.26.[1]  They contend that the juvenile court erred in finding that mother had not established that the beneficial parental relationship exception to adoption applied.[2]  We disagree and affirm the orders.

## BACKGROUND

I.    Detention and petitions

The family consists of mother, father, and their three children, R.H. (born July 2012), Ev.H. (born January 2015), and Ernesto (born January 2016).

In 2017, the family came to the attention of the Los Angeles Department of Children and Family Services (DCFS) when mother gave birth to a premature child who died shortly thereafter.  Mother tested positive for methamphetamine.  Father, who had separated from mother, called her a " 'ghost,' " appearing and disappearing at whim from their lives.  He said she did not want to be a mother and had left the two oldest children with him.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

[2] Father joins mother's argument but states only that if the order terminating her parental rights is reversed, the order terminating his parental rights also must be reversed.  (See, e.g., *In re Mary G.* (2007) 151 Cal.App.4th 184, 208 [court may not terminate rights of only one parent].)  We therefore focus on mother.

In September 2017, DCFS filed a petition under section 300 alleging that parents' use of illicit substances rendered them unable to care for the children, placed the children at risk of serious physical harm, and constituted a failure to protect (§ 300, subd. (b)).  The juvenile court detained the children, released them to father, and ordered visits with mother at least twice a week for two hours each visit.

However, by the time of the October 2017 adjudication hearing, mother had visited the children just once.  At the hearing, the juvenile court dismissed the allegations against father, sustained the allegations against mother, declared the children dependents of the court, removed them from mother and placed with them father under DCFS supervision, and ordered family maintenance and reunification services.

Thereafter, mother called the children at Christmas but otherwise had no contact with them from October 2017 through March 2018.

Then, in April 2018, DCFS filed a section 342 petition as to father based on allegations that he abused marijuana and that his mental and emotional problems rendered him incapable of caring for the children.  The juvenile court sustained the petition and removed the children from father.  The children were placed with a foster family and have remained with them throughout these proceedings.

Mother had been in contact with DCFS since at least the end of May 2018.  She wanted to reunify with the children and was trying to comply with her case plan by agreeing to drug test, completing parenting classes, attending domestic violence classes and counseling, and entering an inpatient drug treatment center.  Mother had at least 10 visits with the children from the end of

3

May to July 27, 2018. The children's caregivers reported that the children sought mother's attention during the visits and were happy during them. Mother played with the children and was affectionate. She also called four to five times a week to check on the children.

In August 2018, the juvenile court ordered continued family maintenance services.

## II.    November 2018:  the six-month review hearing

According to a report prepared for the six-month review hearing, the children had adjusted to their new home and were doing well. Mother's visits also were going well. R.H. looked forward to visits with her parents, whom she said she loved. She also said she wanted to go home. Mother remained enrolled in various programs but had been discharged from her residential treatment facility because she helped another client fake a negative drug test. Her random drug tests had been negative since July 2018. Mother had completed a parenting class that she said gave her skills to meet the children's needs.

The juvenile court found that parents had made partial progress in their case plans and ordered continued family reunification services.

## III.    May 2019:  the 12-month review hearing

DCFS reported for the 12-month review hearing that the children remained stable in their placement, where their needs were being met, and they were strongly bonded to their caregivers, who wanted to adopt them. R.H. had a positive bond with her foster mother. Ev.H. had a strong bond with foster father, and a pillow made from one of his shirts helped her sleep. However, Ev.H. had some regression by acting out, which

occurred after visits with parents. All three children were in therapy, which was helping to reduce anxiety.

Mother continued to address her substance abuse issues. She also had completed another parenting class. She consistently visited. R.H. said she liked visiting her parents, and Ernesto said he was happy to see his " 'daddy and mommy.' " However, the caregivers reported that the children got out of control during visits, but their behavior changed when they got into the car. The caregivers also said that the children "are always waiting to see their parents."

The juvenile court found that parents were in partial compliance with their case plans, ordered continued reunification services, and liberalized visitation to unmonitored visits two hours a week plus an additional monitored visit.

IV.    October 2019:  the 18-month review hearing

At the 18-month review hearing, the juvenile court found that parents were still only in partial compliance with their case plans.[3]  As to mother, the juvenile court noted that she had one positive drug test in June 2019 and two in August 2019, she was on only the first step of her 12-step program, she was still in individual counseling, and she had been discharged from her sober living arrangement for several months while incarcerated in June and July 2019. And while the quality of her visits with the children was "fine," their quantity was inconsistent. The juvenile court therefore terminated reunification services as to

---

[3] The minute order states that mother's compliance with her case plan was "minimal."

both parents and denied their request for a bonding study and set a termination hearing pursuant to section 366.26.[4]

V.    November 2019 to April 2021 and section 366.26 permanency planning hearing

The section 366.26 hearing was delayed until April 2021, due primarily to the COVID-19 pandemic. In the meantime, the juvenile court changed parents' visits from unmonitored to monitored in March 2020 based on a domestic violence incident in which father hit mother. Although mother obtained a restraining order, she let father have access to the children during a visit with them. Also, the caregivers attributed negative changes to R.H.'s behavior to unmonitored visits with parents. R.H. also said that one of her parents told her not to say anything about what happened during visits.

According to reports prepared for the section 366.26 hearing, the children remained bonded to their prospective adoptive family, and the children were bonded to each other. R.H. said she wanted to remain with the caregivers, and Ev.H. and Ernesto called them mommy and daddy. The children made other ambiguous statements; for example, R.H. said both that she wanted to " 'go live with my parents' " and "I like to be here with [foster mother]." Ev.H. said she liked being with her foster mother because " 'she is the Best Mom just as my real Mom,' " Ernesto said, " 'I like to be here with [foster mother] because I love her.' " He also said he also wanted to " 'live in the visit because my mom is there.' "

---

[4] DCFS and the children's counsel agreed that reunification services should be terminated.

Parents had consistent virtual and telephonic visits with the children, which the caregivers said were going well. Mother was able to redirect the children and maintain quality visits. Sometimes, the children did not want to speak to mother when she called, so R.H. would talk to her because she felt bad that the others would not. When in-person visits resumed in March 2021, the children appeared to be happy, and mother played games with them. The children said that mother told them she loved them. Ernesto said he felt good during a March 2021 visit with his parents, Ev.H. said she was happy to see her mom, and R.H. said she felt good and happy after the visit and wanted to go back with my "family."

At the hearing, parents argued that the beneficial parental relationship exception to adoption applied (§ 366.26, subd. (c)(1)(B)(i).)[5] In opposition to that argument, the children's counsel described the parent-child visits as friendly in nature but otherwise "not parental at all," and parents were uninvolved with any medical or educational issues. Counsel therefore aligned with DCFS that the beneficial parental relationship exception did not apply.

The juvenile court agreed, stating that while a loving interaction between a parent and child "will always confer some incidental benefit, [ ] that interaction and the frequent relationship is not enough to overcome the need for stability. The parent must also occupy a parental role and not just a friendly visit, and that parental role is absent in this case." The juvenile

[5] Before the hearing, mother and father had filed multiple section 388 petitions arguing that their circumstances had changed such that reunification services should be reinstated, but the juvenile court denied the petitions.

7

court therefore found that the children were adoptable, that parents had not established a bond with the children, and that any relationship parents had with the children was outweighed by the physical and emotional benefit the children would get from the permanency and stability adoption would provide. Finally, returning the children to mother and father would be detrimental. The juvenile court terminated parental rights.

## DISCUSSION

I.    The beneficial parental relationship exception and standard of review

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has decided to end reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1).) When the juvenile court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates terminating parental rights unless the parent can demonstrate an exception applies. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625.)

The exception at issue is the beneficial parental relationship, which asks whether any harm from severing the parent-child relationship outweighs the benefit of placing the child in an adoptive home. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) The parent bears the burden of establishing by a preponderance of the evidence (1) regular visitation and contact with the children, (2) a relationship, the continuance of which would benefit the children, and (3) terminating parental rights would be detrimental to the children. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.*, at p. 631.)

The first element requires consistent visitation. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) The second element involves numerous factors, such as the child's age, the portion of the child's life spent in the parent's custody, the positive or negative effect of interaction between parent and child, the child's specific needs, and how the child feels about and interacts with, looks to, or talks to the parent. (*Ibid.*; *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575–576.) The third element considers how losing the parental relationship would affect the child. (*In re Caden C.*, at p. 633.) Would the benefit of a new adoptive home outweigh the harm to the child from losing a significant, positive relationship with the parent? (*Id.* at pp. 633–634.) The overall inquiry thus is a "subtle enterprise." (*Id.* at p. 634.)[6]

The juvenile court's undertaking of this enterprise in *In re Caden C.* led it to conclude that the mother *had* met her burden of proving the exception's applicability, but the Court of Appeal reversed. On review, the Supreme Court clarified that the first two elements of the exception are reviewed for substantial evidence. (*In re Caden C.*, *supra*, 11 Cal.5th at p. 639.) The third element involves factual determinations reviewed for substantial evidence, but the ultimate decision, whether terminating

---

[6] *In re Caden C.*, *supra*, 11 Cal.5th at page 637, clarified that a parent's struggles with the issues causing the dependency are not a categorial bar to applying the exception but are relevant to its application where, for example, such struggles cause interaction with the child to be negative. Neither the juvenile court below nor DCFS on appeal relied on mother's struggles with drug abuse to justify the orders in this case.

parental rights would be detrimental to the child, is reviewed for abuse of discretion. (*Id.* at p. 640.)

In contrast to *In re Caden C.*, the juvenile court here found that mother *did not* carry her burden of proving the exception. In such a case, where the trier of fact has "expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case (*Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 742 [trier of fact is the exclusive judge of the credibility of the evidence and can reject evidence as unworthy of credence]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 659–660 [trial court is entitled to reject in toto the testimony of a witness, even if that testimony is uncontradicted])." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989.) Where, as here, the issue turns on a failure of proof, we determine whether the evidence compels a finding in appellant's favor as a matter of law, asking whether that evidence was uncontradicted and unimpeached and of such a character and weight as to leave no room for a judicial determination it was insufficient to support a finding. (*In re I.W.*, at p. 1528.)

10

## II.    Visitation

DCFS has conceded that mother satisfied the first element, regular visitation.  We accept that concession and turn to the remaining elements of the exception.[7]

## III.    Parent-child relationship

The second element required mother to establish she had a relationship with the children, the continuance of which would benefit the children.  (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The children must have a substantial, positive, emotional attachment to her.  (*Id.* at p. 636.)  The attachment must be significant and something more than the incidental benefit that interaction between a parent and child will always confer.  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)  To make this showing, mother had to produce evidence about how long she cared for the children, the children's needs, the positive or negative effect of her interaction with the children, and how the children feel about and interact with her.  (*In re Caden C.*, at p. 632.)  As we now explain, mother's showing on these factors was inadequate.

When dependency proceedings were instituted in 2017, R.H. was five years old, Ev.H. was two years old, and Ernesto was one year old.  By the time of the section 366.26 hearing, the children had lived with their caregivers for three years.  Ernesto had thus spent the majority of his life outside his mother's custody.  Ev.H. had spent more time—a year more—with her caregivers than with mother.  Only R.H. had lived a greater

---

[7] In view of that concession, we have not described the frequency and duration of mother's visitations in detail.

11

portion of her life with mother.  Even so, there was evidence that mother was not very present before the children became dependents of the court, because father described mother as a "ghost," disappearing in and out of her children's lives and leaving R.H. and Ev.H. with father.  Additionally, for the first six months of the dependency proceeding, mother remained virtually absent from the children's lives.

As for the children's needs, they had all initially required therapy to help them with anxiety and separation issues.  But those needs had resolved by the time of the section 366.26 hearing.  The children had no special needs, and the caregivers met any needs the children had.  Thus, there is no evidence that the children had some need that only mother could provide.

Next, although interaction between the children and mother was positive, there was also evidence it was not wholly so. The caregivers reported that sometimes the children were out of control during parental visits but would calm down once they got into the caregivers' car.  And although we understand the difficulties of telephonic and virtual visitation between a parent and child, especially younger ones, the two younger children at times did not want to talk to mother, and the record suggests that R.H. sometimes talked to mother so that mother would not feel bad about the other children ignoring her.  Thus, to some slight extent, this shows that the children did not crave or seek mother's attention.

Moreover, there is scant evidence about the *essential* nature of mother's interactions with the children and how the children felt about her.  To be sure, their interactions as a general matter were positive and affectionate, and the children made loving statements about mother, as she did about them.

However, when we say "essential" we are referring to evidence about whether and in what ways the children looked to mother, talked to her, and interacted with her. (See, e.g., *In re Caden C.*, *supra*, 11 Cal.5th at p. 632.) Stated otherwise, is there any evidence that mother and the children interacted in ways beyond what might occur during a playful visit? The closest example of evidence that speaks to the point we are making is that a pillow made from a shirt helped Ev.H. sleep—but that pillow was made from the foster father's shirt, not mother's shirt. This record contains no similar evidence showing, for example, that any of the children ever turned to mother to comfort them. Indeed, the record is bereft of statements from even mother about such positive, intimate interactions.[8]

Mother therefore has not shown that a different result is compelled as a matter of law. Rather, what we can glean about mother's relationship with the children from this record is, as the juvenile court suggested, it was akin to that of a friendly visitor. Unlike in *In re Caden C.*, *supra*, 11 Cal.5th at page 627, we do not have the benefit of a bonding study or expert psychologists' testimony. While the juvenile court denied mother's requests for a bonding study—a request trial courts should "seriously consider"—that ruling is not before us, and the juvenile court told

---

[8] Mother did not testify at the section 366.26 hearing. She did testify at the 18-month review hearing, but her testimony focused on her progress in her case plan and that the children could live at her treatment facility.

mother she could obtain one on her own.[9]  (See, e.g., *id.* at p. 633, fn. 4 [trial courts should "seriously consider" allowing bonding study or relevant expert testimony where appropriate].)  At most, the evidence shows that interaction between mother and the children conferred "some incidental benefit" but stopped short of that "significant attachment" resulting from a parent's attention to the children's "needs for physical care, nourishment, comfort, affection and stimulation."  (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Given this, we are unpersuaded by mother's suggestion that any misapplication of the law by the juvenile court requires reversal.  The juvenile court did say a "parent must also occupy a parental role."  As the court in *In re Caden C.*, *supra*, 11 Cal.5th at page 634, said in deciding whether terminating parental rights would be detrimental to a child, it is improper to compare a "parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)."  The section 366.26 hearing is not a contest about who would be the better custodial caregiver, as returning the child to live with the parent is not an issue at the hearing, and as a parent who does not have custody of their child generally cannot provide for the child's educational, medical, and like needs.  (*In re Caden C.*, at p. 634.)

Still, the juvenile court made its comment in the context of noting that a parent's positive visits with her children "will always confer some incidental benefit," but that such incidental benefit did not outweigh the children's need for stability.  The

---

[9] This may be a cost-prohibitive option for many parents, which is why we second the Supreme Court's admonition to trial courts to seriously consider permitting such studies where appropriate.

juvenile court then added that the parent must occupy a parental role and not just have friendly visits. The juvenile court went on to clearly find that mother had not established a bond with the children, and that any relationship she had with them was outweighed by the benefit the children would get from being adopted. The juvenile court thus did not base its ruling on a finding that mother failed to occupy a parental role or find that mother had to attend the children's medical appointments to establish such a parental role.

This case is therefore not like *In re D.M.* (2021) 71 Cal.App.5th 261, cited by mother. In that case, the juvenile court improperly based its decision terminating parental rights on its finding that father had not attended the children's medical and dental appointments, which a parent would normally do. (*Id.* at p. 268.) In contrast, the juvenile court here did not criticize mother for not attending the children's medical appointments. Instead, the juvenile court seemed to be saying that, overall, mother was more like a friendly visitor than a parent, an observation which does speak to the absence of a substantial bond between mother and children.

IV.    Detriment

Because mother failed to carry her burden to establish a benefit to the children from maintaining their relationship with her, we need not address whether terminating the parental relationship would outweigh the benefits of adoption, as all three elements must be established for the exception to apply. But, in brief, we note that a detriment finding is based on the child's best interest, and "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the

15

benefit to the child of placement in a new adoptive home." (*In re Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The juvenile court here did not err in concluding that terminating mother's parental rights would not be detrimental to the children. This case is unlike *In re Caden C.*, *supra*, 11 Cal.5th at page 628, where an expert suggested that severing that child's relationship with his mother would lead to emotional instability, acting out, difficulties in school, insomnia, anxiety, or depression. In addition to that testimony, there was evidence that the child had an "intense bond" with his mother and was distressed at the idea of not living with her, although he also reacted positively to living with his caregiver. (*Ibid.*)

There is no similar evidence that any of the children in this case would suffer such trauma from severing their relationship with mother. There is no evidence, for example, that the children had trouble separating from mother after visits or that they wanted to see her beyond what the visitation schedule allowed.

Instead, there is overwhelming evidence that the children were bonded with the caregivers and wanted to stay with them, even if they also said they loved mother and wanted to be with her. The caregivers provided a stable and loving home, met all of the children's needs, and had a strong bond with the children. Importantly, the children were also bonded *to each other*, and the caregivers had committed to adopting all three children, allowing them to grow up together. The chance—even a slim one—that a permanent plan other than adoption could jeopardize the children growing up together would be part of the detriment to the children of reversing the juvenile court's orders.

## DISPOSITION

The orders terminating mother's and father's parental rights and setting adoption as the permanent plan are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.

17